# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nᵒ 09-CV-93 (JFB) (AKT)

————————————

## LINDA BURKHARDT,

Plaintiff,

VERSUS

## WILLIAM LINDSAY, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS PRESIDING OFFICER OF THE SUFFOLK COUNTY LEGISLATURE AND IN HIS PERSONAL CAPACITY AND AS AN AGENT OF THE COUNTY OF SUFFOLK AND AS AIDER AND ABETTOR, AND COUNTY OF SUFFOLK,

Defendants.

————————————

### MEMORANDUM AND ORDER
September 19, 2011

————————————

Joseph F. Bianco, District Judge:

Plaintiff Linda Burkhardt ("plaintiff" or "Burkhardt") brought this action against defendants William Lindsay ("Lindsay"), in his official capacity as Presiding Officer of the Suffolk County Legislature and in his personal capacity, and the County of Suffolk (collectively, "defendants"), alleging that defendants terminated her from her position as a legislative aide to the Presiding Officer because of her political affiliation and age in violation of the First and Fourteenth Amendments and the Age Discrimination in Employment Act ("ADEA"). Plaintiff and defendants have cross-moved for summary judgment on each of plaintiff's claims. For the reasons set forth herein, defendants' motion is granted in its entirety.

## I. Background

### A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits and respective Local 56.1 statements of facts.[1] Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

————————————

[1] Where only one party's 56.1 statement is cited, the cited fact is not contested by the other party or the other party has offered no evidence to controvert that fact.

Plaintiff's claims stem from her termination as a legislative aide for the Presiding Officer of the Suffolk County Legislature, a position which plaintiff held at various levels for twenty-two years. (Defs.' 56.1 ¶¶ 1-3.) Specifically, plaintiff, a self-described active member of the Republican Party (Burkhardt Depo. at 131:12-14), contends that, in January 2008, Presiding Officer William Lindsay, a Democrat, fired plaintiff and another non-Democrat legislative aide, Francis Siems ("Siems"), in order to fill their positions with Democrats who had lost their jobs. (Pl.'s 56.1 ¶¶ 1-2; Defs.' 56.1 ¶ 3.) At the time of their termination, both plaintiff and Siems were over fifty-five years of age and were eligible to receive a service retirement benefit. (Pl.'s 56.1 ¶ 2.) However, a third legislative aide—a Republican between the ages of thirty and thirty-nine—was not terminated. (Pl.'s 56.1 ¶ 3.) Plaintiff subsequently commenced this action, alleging that she was terminated both because of her political affiliation and because of her age.

By way of background, the Suffolk County Legislature (the "Legislature") holds an organizational meeting each year at the beginning of January, at which the Legislature elects a Presiding Officer from its own members. (Defs.' 56.1 ¶ 20; Defs.' Ex. J[2] (Rules of the Legislature adopted Jan. 2, 2008).) Pursuant to the Rules of the Legislature, which are adopted each year, the Presiding Officer has the power and duty "[t]o appoint and designate or terminate, within budgetary appropriations, all officers and employees of the Legislature not required to be selected by these Rules,"

except for three legislative aides and secretaries which are assigned by each individual legislator to work at the legislator's district office. (Defs.' 56.1 ¶ 20; Defs.' Ex J (Rule 3.A.10).)

Plaintiff was first hired as a legislative aide for then-Presiding Officer Gregory Blass in 1986. (Defs.' 56.1 ¶ 3; Burkhardt Depo. at 11:23-12:5, 13:4-16.) Although plaintiff initially was hired as a secretary, she was promoted after approximately three months to the position of "Legislative Aide II." (Burkhardt Depo. at 10:12-11:25.) It is undisputed that, as established by the Legislature and the Suffolk County Department of Civil Service, there are four levels of "legislative aide" (referred to as levels I, II, III, and IV), with the highest level (level IV) referring to a legislator's Chief of Staff.[3] (Defs.' 56.1 ¶ 9.) As to the distinction between levels I to III, defendant Lindsay testified that an aide is classified on the basis of experience rather than on the basis of the aide's specific job responsibilities:

> [T]he legislative aides one, two, and three really have to do with experience. It isn't that there's a set designation that only a [level] one can handle a constituent call, or [level] a two could only work on a committee. It's, it's [sic] a designation that goes really with experience.

(Lindsay Depo. at 22:11-15.)

During her deposition, plaintiff testified extensively regarding both the work performed by legislative aides generally and

[2] Exhibits attached to plaintiff's and defendants' motion papers by way of declaration are cited to as "Pl.'s Ex." and "Defs.' Ex.," respectively. Any exhibits attached to the parties' reply declarations are cited to as "Reply Ex."

[3] Lindsay testified that very few, if any, Legislative Aide IVs are still employed by the Legislature because they "became too expensive." (Lindsay Depo. at 22:24-23:20.)

the work that she performed in particular. For example, plaintiff acknowledged that legislative aides would "sometimes" have contact with elected officials, other legislators, the County Executive's Office, and the County Executive Budget Office. (Burkhardt Depo. at 15:4-16:20; 99:24-100:12; 123:9-12.) In fact, plaintiff testified that some aides would lobby legislators on behalf of, and at the direction of, the Presiding Officer, and others would "interface" with the county executive on legislative matters for the Presiding Officer. (*Id.* at 115:25-116:7.) Plaintiff also acknowledged that legislative aides would sometimes have contact with constituents, although plaintiff stressed that whether an aide had such contact would "depend on the aide and the responsibilities they were given." (*Id.* at 16:21-25.) Nevertheless, plaintiff clearly conceded that some legislative aides worked on and would attempt to resolve constituent issues, and that there were issues that a legislative aide might be able to resolve under his or her own discretion and then later advise the Presiding Officer regarding their resolution. (*Id.* at 108:19-109:21.)

In addition, regarding committee assignments, it is undisputed that some aides would: (1) act as a liaison between committees, departments, agencies, boards, and commissions; (2) supply committees with information and reports pertaining to departments, agencies, boards, and commissions; (3) conduct investigatory studies of departments, agencies, boards, and commissions; and (4) carry out research pertaining to resolutions. (*Id.* at 96:25-97:16.) As described by plaintiff, the County Executive established "probably close to a hundred" boards or commissions at which legislative aides would represents their legislator or the Presiding Officer. (*Id.* at 105:17-21.) Some aides would have voting authority at these commissions and

some would speak for the Presiding Officer. (*Id.* at 106:3-11.) In addition, some aides worked on the "reapportionment project" after the completion of the federal census, as part of which staff members, including legislative aides, "would sit down with maps and census data and census software to try to make some recommendations to the presiding officer, sometimes individual legislators on changes in their district." (*Id.* at 118:21-119:9.)

Regarding access to confidential information, plaintiff testified that some aides would attend "executive sessions" of legislative sessions, where confidential information would be discussed, and others would attend caucus meetings, where information would be discussed regarding the caucus position on various legislation. (*Id.* at 104:5-20.) In particular, at the caucus meetings, the caucus would discuss information that it would not want to share with the opposite party, and, as such, the legislative aides invited to attend such meetings belonged to the same party as the caucus. (*Id.* at 130:5-131:5.) Lindsay confirmed that several different legislative aides would accompany him to caucuses and would represent him on the rare occasions when Lindsay did not attend the caucus in person. (Lindsay Depo. at 55:23-57:17.)

As to her personal responsibilities, plaintiff testified that, when she first started as a Legislative Aide II,[4] she "drafted proclamations," "drafted responses to constituent letters," and "sometimes" took phone calls from constituents, and had contact with other elected officials and legislators. (*Id.* at 13:4-25.) Plaintiff also

---

[4] At some point during her tenure as a legislative aide, plaintiff was promoted to the position of Legislative Aide III. (Burkhardt Depo. at 88:15-21.) It is not clear from her testimony, however, exactly when this promotion occurred.

testified that she sometimes had contact with the legislative counsel's office, which was responsible for drafting legislation, and with the County Executive's Office. (*Id.* at 18:7-19:13; 14:3-15:3) She also acknowledged that she had "technical knowledge of the rules and procedures of the Suffolk County Legislat[ure]." (*Id.* at 17:22-19:13.) Moreover, in a memo plaintiff wrote to then-incoming Presiding Officer Paul Tonna in or around January 2000[5] (the "Tonna memo"), plaintiff described in detail the "varied responsibilities" she had for different Presiding Officers up until that time. For example, plaintiff explained that, *inter alia*, she: (1) represented the Presiding Officer at a number of committee meetings and took "notes on controversial issues and legislative concerns"; (2) supervised the internship program for a number of years; (3) managed some of the daily work of the staff for Presiding Officers Blass, Blydenburgh, and Rizzo; (4) "worked on numerous types of constitutent problems"; (5) "[w]orked to help in other legislator['s] district offices"; (6) "[l]obbied legislators on behalf of the Presiding Officer"; and (7) "[i]nterfaced with the county [executive's] staff on legislative matters for the Presiding Officer and "[i]nterfaced with various other elected officials and government agencies on behalf of the Presiding Officer." (Defs.' Ex. F.) Plaintiff acknowledged that, while this memorandum described only her personal responsibilities and "not necessarily all legislative aides' responsibilities," some legislative aides other than plaintiff would also have had similar responsibilities. (*Id.* at 103:2-22.)

Additionally, plaintiff testified that, at times, she represented the Presiding Officer on a number of commissions and boards, including the Suffolk Community College Board of Trustees and the Women's Advisory Board, "sometimes with a vote and sometimes without." (*Id.* at 91:18-92:19.) In particular, plaintiff recalled one time when she represented the Presiding Officer at the Seward Agency and "with his concurrence voted for him." (*Id.* at 92:3-4.) Plaintiff estimated that the County and Legislature had between fifty and sixty boards and commissions,[6] and, "at one time or another," plaintiff "probably attended half of them," sometimes "just as an observer" rather than as a representative. (*Id.* at 92:20-25.) Plaintiff "sometimes" participated in discussions at these meetings, but would "rarely" speak on behalf of the Presiding Officer. (*Id.* at 93:2-8.) Specifically, plaintiff testified:

> I mostly would never speak as the presiding officer. I could certainly offer information about the Legislature in general or bring a question back to the presiding officer. But unless he or she already directed me to say something, I would not. . . . Mostly I spent time taking notes, observing things at meetings. Somebody might ask what the date of the next meeting is or what the next committee meeting is at the Legislature. I would offer those kinds. [sic] But people certainly would know if I was there from the presiding officer's office.

[5] The Court notes that although the front of the memorandum is dated January 31, 2009, it is undisputed that the memorandum was actually written in or around 2000 when Tonna became Presiding Officer. (Burkhardt Depo. at 103:2-11; Defs.' Mem. of Law at 3 n.3.)

[6] At another point during her deposition, plaintiff testified that the County Executive had established "probably close to a hundred" boards and commissions. (Burkhardt Depo. at 105:17-21.) In any event, the Court need not resolve this conflict because this distinction is immaterial to the Court's analysis and decision.

But no, I would not speak for the presiding officer, no.

(*Id.* at 93:9-94:2.) Nevertheless, plaintiff acknowledged that, as a general matter, there were occasions where a legislative aide would be instructed to act on behalf of the Presiding Officer at a board or commission and would be given voting authority. (*Id.* at 94:5-14.) In addition, plaintiff represented the Presiding Officer at Charter Revision Committee Meetings, for which she would prepare copies of the Suffolk County Charter for the committee and would do research for the committee, if asked. (*Id.* at 118:2-12.) Plaintiff would also report to the Presiding Officer regarding the committee's recommendations and would sometimes offer her opinion as to those proposed revisions. (*Id.* at 118:13-20.)

In 2004, plaintiff's responsibilities expanded when she was appointed as Chief of Staff for then-Presiding Officer Joe Caracappa. (Burkhardt Depo. at 84:8-16.) In particular, plaintiff described that, as Chief of Staff, she "managed the office and the staff" for the Presiding Officer, including by "let[ting] [the Presiding Officer] know everything that was going on in the office, and what his schedule looked like, what committees were coming up, [and] what issues were going on." (*Id.* at 84:19-25.) However, when it became clear that Caracappa would not be re-elected as Presiding Officer, Caracappa "put [plaintiff] in a Legislative Aide 3 position where [she] had been before" so that William Lindsay, as the anticipated incoming Presiding Officer, would have the Chief of Staff position open upon his election. (*Id.* at 87:9-24.) When Lindsay, who is a Democrat, ultimately took office in 2006, he significantly reduced plaintiff's job responsibilities due to her Republican Party affiliation. (*Id.* at 141:20-22; Lindsay Depo. at 62:21-22.) Specifically, Lindsay testified

that, although he kept plaintiff on staff because, *inter alia*, her experience in the Legislature was useful to him, he had to limit plaintiff's role because she was a member of the "opposite party" and therefore could not attend caucuses or "[r]epresent [Lindsay] at meetings that would have a political flavor to them." (Lindsay Depo. at 62:4-63:15.) Nevertheless, plaintiff did continue to attend some committee meetings after Lindsay became Presiding Officer. (*Id.* at 63:18-21.)

Notably, the job responsibilities of legislative aides, as described by plaintiff, are consistent with the responsibilities listed in the civil service job descriptions for legislative aides. As an initial matter, the "general duties" of a "Legislative Aide" are listed as "assist[ing] the Legislature in research duties necessary for the operation of the Suffolk County Legislature." (Defs.' Ex. G.) Moreover, "[t]o facilitate the functioning of Committees," a "Legislative Aide" shall assist "Committee Chairpersons and Legislators in the following areas:"

Establish and maintain liaison between committees, departments, agencies, boards and commissions under the purview of the committee.

On a recurring basis, supply the committee with information and reports pertaining to departments, agencies, boards and commissions operating and planning status.

With approval of Chairperson, conduct investigatory studies of departments, agencies, boards and commissions under jurisdiction of committee through research, personal interviews, field trips, etc.

Carry out research pertaining to resolutions before committee as

directed by committee members through chairperson. Generate ideas for resolutions and programs for problem solution, as appropriate.

Supply the committee with information pertaining to the state-of-the-art within departments, agencies, boards and commissions under the committee.

Review committee resolutions and business and ensure that sufficient supportive materials are available for committee to pass intelligently on resolutions.

Verify and distribute minutes to committee members. Ensure that all minutes, supportive materials, resolutions and other documents pertaining to committee are filed in the legislative library accurately inserted in Legislature Accountive Data System (LADS).

Under direction of chairperson, assist in preparation and coordinate release of information to press as appropriate.

Assist in the planning of the agenda for committee meetings.

(*Id.*) The job description also contains the broad statement that a Legislative Aide shall "[p]erform any other committee duties as requested by the committee chairperson or Presiding Officer." (*Id.*)

Similarly, a Legislative Aide II, in addition to "[a]ssisting the Legislature in research duties necessary for the operation of the Suffolk County Legislature," is also tasked with "facilitate[ing] the functioning of Committees, . . . [and] assist[ing] Committee Chairpersons, other Legislators,

the Counsel to the Legislature, and the Clerk's Office" by performing the following specific duties:

> 1) Gathers information and prepares reports to Legislative standing committees.
>
> 2) Under the direction of Committee Chairperson or the other Legislators, will research resolutions prior to the Committee meetings.
>
> 3) Will collect back-up material for resolutions from various departments and organizations and make it available to Committee members.
>
> 4) Assist in the planning of the agenda for Committee meetings.

(*Id.*) As with the description for a "Legislative Aide," a Legislative Aide II shall also "[p]erform[] related work as required." (*Id.*) As to the responsibilities of a Legislative Aide IV,[7] who acts as the

---

[7] Defendants did not supply a job description for the Legislative Aide III position during discovery. However, defendants did submit "duties statements" for all four levels of Legislative Aides, including one for the Legislative Aide III position, with their reply papers. (Defs.' Reply Ex. N.) Plaintiff challenges the admission of these duties statements on the grounds that they were not produced during discovery and, in any event, are lacking in probative value because defendants did not provide evidence that the Legislative Aide III position was ever "certified" or that New York State Civil Service approval was ever obtained for the Legislative Aide IV description. (Pl.'s Reply at 3.) The Court, however, need not resolve this dispute because, for the reasons set forth herein, even without consideration of the "duties statements," it is clear from plaintiff's testimony and other evidence in the record that the position of legislative aide held by plaintiff was a policymaking position that was not

Chief of Staff for the Presiding Officer, the duties for this position are similar to those for other legislative aide positions, but are more extensive in scope. Specifically, a Legislative Aide IV "reports directly to the Presiding Officer on a regular basis" and is responsible for, *inter alia*, "oversee[ing] the staff of the Presiding Officer with regard to work assignments and committee reports," "establish[ing] and maintain[ing] liaison between Committees, County Departments, Agencies, Boards, and Commissions," supplying committees with information and reports on a "recurring basis," and conducting investigatory studies. (*Id.*)

The Court also notes that these civil service job descriptions not only are consistent with plaintiff's deposition testimony, but also are consistent with the general job descriptions contained in the "vacant position review" forms submitted by plaintiff in connection with her work as a Legislative Aide II in 1986 and 1988. (*See* Pl.'s Ex. H Vacant Position Review, dated May 6, 1986 ("This position is assigned to the Presiding Officer's Office in Hauppauge. Employee does research work on resolutions, attends committee meetings and reports findings back to the Presiding Officer. Performs related work as required."); *see id.* Vacant Position Review, dated Oct. 27, 1986 (same); *see id.* Vacant Position Review, dated Feb. 10, 1988 ("The employee would do research work on resolutions, attend Committee and Legislative meetings of the Legislature, and perform related work as required.").)

_____

constitutionally protected from termination based on political affiliation. Accordingly, for purposes of the pending cross-motions, the Court will not consider or rely upon the duties statements provided at Exhibit N to defendants' reply papers. Likewise, the Court also will not consider the affidavit submitted by defendants at Exhibit M regarding the duties statements.

## II. Standard of Review

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward

with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone "will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars' showing that a trial is needed." *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. Discussion

Defendants and plaintiff have cross-moved for summary judgment with regard to each of plaintiff's claims. First, with regard to plaintiff's First Amendment claim, defendants argue that the position of legislative aide is a confidential, policymaking position for which there is no constitutional protection from termination based upon political party affiliation. Plaintiff, in contrast, contends that her position was essentially a ministerial position, rather than a policymaking one, and that, as such, she was protected from termination based upon her political affiliation. Second, defendants argue that plaintiff has failed to failed to establish a *prima facie* case that she was discriminated against on the basis of her age in violation of the Equal Protection Clause, and that, in any event, defendants have established legitimate, non-discriminatory reasons for terminating plaintiff. Third, defendants contend that plaintiff's "disparate impact" ADEA claim fails because, *inter alia*, plaintiff has failed to put forth sufficient statistical evidence to establish disparate impact.[8] For the reasons set forth *infra*, the Court agrees with defendants that they are entitled to summary judgment on all of plaintiff's claims. Specifically, the Court concludes that: (1) the uncontroverted evidence (including plaintiff's own testimony and documents) clearly demonstrates that the position of legislative aide is a policymaking position that is not protected under the First Amendment from termination for political reasons; (2) plaintiff has failed to present sufficient evidence from which a reasonable jury could find age discrimination; and (3) plaintiff has failed to put forth sufficient statistical or other evidence to survive summary judgment on her disparate impact claim. Accordingly, the Court grants defendants' motion for summary judgment in its entirety.

---

[8] Plaintiff also brought a "disparate treatment" claim under the ADEA, on which defendants had also moved for summary judgment. Plaintiff, however, conceded at oral argument that her disparate treatment claim is barred by the Supreme Court's decision in *Gross v. FBL Financial Services*, 129 S.Ct. 2343, 2350-51 (2009). Accordingly, the Court need not address the parties' arguments on this issue, and plaintiff's disparate treatment claim is dismissed.

## A. First Amendment Claim

Defendants do not dispute, for purposes of the pending motion, that plaintiff was terminated on the basis of her political affiliation. (Defs.' Mem. of Law at 24 ("Presiding Officer Lindsay replaced Plaintiff with better qualified candidates who shared the same political ideology with the Presiding Officer, and who became available after being terminated from their positions by the Town of Brookhaven.").) Accordingly, the Court assumes *arguendo* that plaintiff's dismissal was politically motivated and proceeds to analyze the ultimate question of whether that termination was constitutionally permissible under the facts of this case. For the reasons set forth *infra*, the Court concludes that plaintiff was not constitutionally protected from termination based upon her political affiliation.

### 1. Legal Standard

As a general matter, public employees may not be discharged for exercising their First Amendment rights. *See Elrod v. Burns*, 427 U.S. 347, 360 (1976); *accord Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995). However, the Supreme Court has created an exception to this rule for "policy-making and confidential employees," for whom political viewpoints are permissible employment criteria and who, accordingly, "may be discharged by reason of political affiliations, political beliefs, ideological viewpoints or partisan activity." *Kaluczky*, 57 F.3d at 208 (internal quotation marks and citations omitted). Specifically, as summarized by the Court in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990):

> In *Elrod*, we suggested that policymaking and confidential employees probably could be dismissed on the basis of their political views. In *Branti* [*v. Finkel*, 445 U.S. 507 (1980)], we said that a State demonstrates a compelling interest in infringing First Amendment rights only when it can show that "party affiliation is an appropriate requirement for the effective performance of the public office involved."

*Id.* at 71 n.5 (internal citations omitted). The Court in *Branti* also explained that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved." *Branti*, 445 U.S. at 518.[9]

The Second Circuit has "interpreted the *Branti* test to mean 'that political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance.'" *Regan v. Boogertman*, 984 F.2d 577, 580 (2d Cir. 1993) (quoting *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988)). In determining whether such a connection exists, courts in this Circuit consider several factors, namely:

> whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is

---

[9] Although the "policymaker" label is no longer determinative after *Branti*, the Second Circuit nevertheless "use[s] the term 'policymaker' as a 'convenient shorthand' for a government employee who occupies a position for which party affiliation, loyalty or confidence are appropriate." *Kaluczky*, 57 F.3d at 208 (quoting *Regan v. Boogertman*, 984 F.2d 577, 580 (2d Cir. 1983)). This Court will do the same here.

authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders.

*Vezzetti v. Pellegrini*, 22 F.3d 483, 486 (2d Cir. 1994). "This list is not exhaustive, but instead serves as a guide; no one factor or group of factors is always dispositive." *Butler v. New York State Dep't of Law*, 211 F.3d 739, 744 (2d Cir. 2000); *see also Vona v. Cnty. of Niagara*, 119 F.3d 201, 209 (2d Cir. 1997) (finding a rational connection between shared ideology and job performance even where only three factors supported such a finding because "these factors are not weighed against each other but instead are used as a guide" and the "inherent power" of the position in question "may require the occupant to influence government programs and be responsive to politics").

Moreover, in analyzing these factors, a court must focus not on "what duties the [plaintiffs] have actually performed or whether they have been involved in policy-making decision," but instead on "the inherent duties of the position" in question. *Vona*, 119 F.3d at 207; *accord Butler*, 211 F.3d at 744 ("The issue is not whether [plaintiff] independently made policy from day to day, but rather what the general required duties of her position were."); *Regan*, 984 F.2d at 580 ("It is necessary to scrutinize the functions of the position to determine whether there is [a rational] connection [between shared ideology and job performance]. . . . [W]e do not merely look to [plaintiff's] actions taken while in office. Rather, we also look at the power with which she is vested by law, and which is inherent in the office."). This inquiry is "informed solely by the job description and

the powers of the office," including consideration of any statutory job descriptions that may exist for the position. *Danahy v. Buscaglia*, 134 F.3d 1185, 1191 (2d Cir. 1985); *see also Vona*, 119 F.3d at 207 ("Our analysis of the inherent duties of [plaintiff's position] focuses on the job description of that position."); *Gordon v. Cnty. of Rockland*, 110 F.3d 886, 888 (2d Cir. 1997) ("The idea that job performance (rather than job description) should control *Elrod-Branti* analysis has been consistently rejected by this court and others. . . . [T]his court's challenge is to discern the *duties inherent* in the offices held by the plaintiffs." (emphasis in original) (internal citations omitted)). Where an employee's job description contains responsibilities that are broad and not well-defined, that employee "'more likely functions in a policymaking position' not protected from patronage dismissals." *Vona*, 119 F.3d at 207 (quoting *Elrod*, 427 U.S. at 368). However, when the official job description in the record "does not, by itself, conclusively establish whether the employee is a policymaker," there may be "underlying factual questions about the actual powers of the job that would be relevant to answering this question." *Morin v. Tormey*, 626 F.3d 40, 46 n.5 (2d Cir. 2010) (finding that the Court could not determine whether plaintiff was a policymaker based on job description alone where description contained a disclaimer that the "typical" duties described therein did "not include all job duties performed by employees in this title and every position does not necessarily require these duties" (alterations omitted)).

Finally, although the policymaker inquiry may require reference to facts in the record, the question ultimately is a legal one that may be decided by a Court on a motion for summary judgment. *See Danahy*, 134 F.3d at 1191 (noting that policymaker inquiry "presents a question of law");

*Gordon*, 110 F.3d at 889 (noting that "other circuits, including this one, assume the issue is one of law, and treat it as such" and citing cases that appropriately analyzed this issue as a matter of law on summary judgment).

## 2. Analysis

As an initial matter, plaintiff argues that the Court cannot resolve the policymaker question by reference to the civil service job descriptions provided by defendants because these descriptions, according to plaintiff, contain "no indicia of pedigree" and two of them are missing a second page that would "include entries to be completed to reflect certification of the position by the Department of Civil Service and approval by the appointing authority." (Pl.'s Mem. Of law at 25.) Thus, plaintiff contends that the job descriptions "cannot be deemed credible or reliable." (*Id.*) The Court, however, disagrees and finds that these job descriptions are relevant to the Court's analysis. First, despite her contentions in her papers, plaintiff herself acknowledged at her deposition that she recognized these descriptions as "the job description from the Department of Civil Service," and noted that "some legislative aides do this and more, and some do less." (Burkhardt Depo. at 90:14-91:17.) Moreover, the job descriptions are consistent with, and corroborate, both plaintiff's testimony and the other evidence in the record regarding the duties of legislative aides. Accordingly, the Court finds that the civil service job descriptions[10] are probative on the question of whether the legislative aides were policymakers. In any event, even if the Court were to disregard the job descriptions, the Court would still find that the position of legislative aide is a policymaking one based upon plaintiff's testimony and other evidence presented regarding plaintiff's personal responsibilities and the responsibilities of other legislative aides. Therefore, as set forth herein, the Court finds that plaintiff was not constitutionally protected from termination based upon her political affiliation, and the Court consequently grants summary judgment in favor of defendants on this claim.

### a. Exemption from Civil Service Protection

Plaintiff concedes that legislative aides are exempt from civil service protection. (Burkhardt Depo. at 100:13-18; 151:11-13.) Notably, "determining whether it makes sense to exempt . . . positions from First Amendment protection involves many of the same factors that New York State already has considered in exempting these public employment positions from its constitutionally-mandated civil service system," namely, "'the confidential nature of the position, the performance of duties which require the exercise of authority or discretion at a high level, or the need . . . to have some expertise or personal qualities which cannot be measured by a competitive exam.'" *Savage*, 850 F.2d at 69 (quoting *Burke v. Axelrod*, 456 N.Y.S.2d 135, 137 (N.Y. App. Div. 1982)). Accordingly, "although employees are not automatically exempted from First Amendment protection just because they are exempt from civil service protection, *Gordon*, 110 F.3d at 890 n.5, the Second Circuit has stated that '[b]oth the interests of federalism and the conservation of judicial resources would ordinarily be better served by the federal courts' giving substantial deference to the state's judgment.'" *Alberti v. Cnty. of Nassau*, 393 F. Supp. 2d 151, 166 (E.D.N.Y. 2005) (quoting *Savage*, 850 F.2d at 69). Therefore, this factor weighs in favor of a finding that legislative aides are policymakers.

---

[10] As noted *supra* in note 7, however, the Court has not considered the "duties statements" filed by defendants as Exhibit N to their reply papers.

### b. Technical Competence or Expertise

Plaintiff acknowledged that she had "technical knowledge of the rules and procedures of the Suffolk County Legislat[ure]," and that other legislative aides could have similar knowledge. (Burkhardt Depo. at 17:22-19:13.) Some aides also worked on budgetary issues, including the preparation of the budget (*id.* at 100:22-24; 108:13-15) and working on the "legislative contingency program." (*Id.* at 122:2-21.) As described by plaintiff, the legislative contingency program, which plaintiff helped to coordinate with the Budget Review Office (*id.* at 122:13-14), involved the allocation of "money that the Legislature set aside for each legislator to spend usually in their district at their discretion through resolution." (*Id.* at 122:4-7.) This program, according to plaintiff, involved "a lot of legal requirements" and "require[d] some technical proficiencies as to . . . the procedures" to follow. (*Id.* at 122:12-13, 122:20-21.) Likewise, plaintiff noted in the Tonna memo that she was involved in "[d]raft[ing] legislation and sense resolutions," "[c]onstructing budget amendments," and "review[ing] budget, reports and audits for the presiding office." (Defs.' Ex. F at 4.) Although plaintiff argues in her papers that legislative aides are not required to possess any specific "technical competence" in order to obtain the position, (Pl.'s Mem. of Law at 21), the Court finds that this factor weighs in favor of a finding that plaintiff's job as a legislative aide was a policymaking position. Indeed, even if it is true that legislative aides need not possess a particular type of technical expertise, such as a legal or other advanced degree, the fact that some aides can—and do—possess certain types of expertise, including on procedural and budgetary topics, indicates that technical knowledge may be considered part of the inherent duties of the position. Accordingly, this factor weighs in favor of a finding that plaintiff held a policymaking position. *See Alberti*, 393 F. Supp. 2d at 172 ("Expertise in 'municipal budget oversight,' is a strong indicator of 'policymaking' status." (quoting *Fry v. McCall*, No. 95-cv-1915, 1998 WL 770563, at *6 (S.D.N.Y. Nov. 4, 1998))).

### c. Control over Others

Although plaintiff attempts in her papers to minimize her supervisory responsibilities (Pl.'s Mem. of Law at 21), the Tonna memo—written prior to plaintiff's appointment as Chief of Staff in 2004, which resulted in an increase in her supervisory duties—clearly indicates that plaintiff not only supervised the intern program for a number of years, but also had supervised staff members for at least three Presiding Officers. (*See* Tonna Memo (Defs.' Ex. F) at 2 ("For numerous years, I supervised the internship program. . . . Under Presiding Officer Blass and under Presiding Officer Blydenburgh and Presiding Officer Rizzo, I managed some of the everyday work of the staff, including assignments and coverage of committee meetings."); *id.* at 4 ("Staff Management—I have managed the staff assignments and committee assignments.").) Plaintiff also conducted interviews for the Presiding Officer's office "[u]p until virtually the time she was terminated." (Pl.'s 56.1 ¶ 39.) Moreover, plaintiff testified that other legislative aides were also responsible for supervising others, including interns, and that some aides might occasionally be involved in recommending certain interns for hiring. (Burkhardt Depo. at 98:24-25; 106:12-17.) Accordingly, the Court concludes that the ability to supervise and control others falls within the scope of duties with which a legislative aide could inherently be tasked (and with which plaintiff was tasked), and this factor

therefore weighs in favor of a finding that plaintiff was a policymaker.

### d. Acting and Speaking on behalf of a Policymaker

The Second Circuit has grouped the remaining five factors—whether the employee is authorized to speak in the name of policymakers, is perceived as a policymaker by the public, influences government programs, has contact with elected officials, and is responsive to partisan politics and political leaders—together for purposes of the policymaker analysis, noting that these factors "together encompass a principle upon which this circuit has placed primary importance: whether the employee in question is empowered to act and speak on behalf of a policymaker, especially an elected official." *Gordon*, 110 F.3d at 890; *see also Cicchetti v. Davis*, No. 07-cv-10546 (WCC), 2008 WL 619013, at *3 (S.D.N.Y. Mar. 5, 2008) ("The last five factors can be condensed into the question 'whether an employee . . . is empowered to act and speak on behalf of a policymaker, especially an elected official.'" (quoting *Gordon*, 110 F.3d at 890)).

Although plaintiff argues that her position was inherently a ministerial one, the Court finds that the record belies this argument and instead supports a finding that legislative aides may be empowered to act and speak on behalf of a policymaker or elected official. *See Alberti*, 393 F. Supp. 2d at 166 ("The *Elrod-Branti* inquiry focuses on 'the duties inherent in the offices held by the plaintiffs,' and not what the plaintiffs *actually did* while in office. Thus, an employee's argument that he or she was merely 'clerical' is unpersuasive where that employee's own description of his or her position indicates that it is confidential and involves close and substantial contact with policymaking officials." (internal citations

omitted)). First, plaintiff explained at her deposition that not only were legislative aides assigned to act as liaisons to certain boards and committees, but some of these aides also were given voting authority and were given authority to speak for the Presiding Officer at meetings for these boards and commissions. (Burkhardt Depo. at 94:5-14, 105:17-21, 106:3-11.) Indeed, although plaintiff "rarely" spoke "for" the Presiding Officer, insofar as she did not speak without being directed first to do so, it is undisputed that plaintiff was authorized, at the very least, to speak generally at the meetings she attended for the Presiding Officer, and that she was "certainly" perceived by others as attending from the Presiding Officer's office. (*Id.* at 93:9-94:2.) For example, at these meetings, plaintiff would offer information about the Legislature and would bring questions back to the Presiding Officer. (*Id.* at 93:9-11.) In addition, plaintiff noted that she sometimes had a vote on the commissions and boards for which she represented the Presiding Officer, and she specifically recalled voting for the Presiding Officer at a meeting of the Seward Agency. (*Id.* at 91:18-92:19, 92:3-4.) Moreover, it is undisputed that, as a general matter, some legislative aides were instructed to act on behalf of the Presiding Officer at such meetings and were given voting power. (*Id.* at 106:3-11; 94:5-14.) It is also uncontroverted that several legislative aides attended caucus meetings either with or on behalf of Lindsay, and that any aides who accompanied him would be responsible for giving "any input that they might have acquired through representing [Lindsay] at either a committee hearing, or a board, or commission, that would be pertinent to the pending legislation," and that such input would be given either to Lindsay directly or by speaking to the entire caucus. (Lindsay Depo. at 56:20-57:5.)

Second, regarding public perceptions about a legislative aide's role as a policymaker, plaintiff testified that, regardless of whether she spoke for the Presiding Officer at board and commission meetings, attendees at those meetings would "certainly know" that plaintiff was attending the meeting for the Presiding Officer. (Burkhardt Depo. at 93:24-25.) Moreover, even shortly after she was first hired as a Legislative Aide II, plaintiff's duties included drafting responses to constituent letters and taking phone calls from constituents. (*Id.* at 13:4-25.) Indeed, in the Tonna memo, plaintiff noted that she had "worked on numerous types of constituent problems." (Defs.' Ex F.) As to the responsibilities of other legislative aides generally, plaintiff testified that other legislative aides had contact with constituents, and that there were occasions when a legislative aide could resolve a constituent issue on his or her own without prior consultation with the Presiding Officer. (*Id.* at 16:21-25, 108:19-109:21.)

Third, there is evidence that plaintiff also had influence over government programs, as indicated by her description in the Tonna memo that she "[l]obbied legislators on behalf of the Presiding Officer." (Defs.' Ex. F.) Plaintiff also had contact with the legislative counsel's office, which was responsible for drafting legislation, (Burkhardt Depo. at 18:7-19:3), and she would offer her opinion to the Presiding Officer regarding revisions to the Suffolk County Charter proposed by the Charter Revision Committee. (*Id.* at 118:13-20.) She also testified that other legislative aides similarly were responsible for lobbying legislators on behalf of, and at the direction of, the Presiding Officer. (*Id.* at 115:25-116:4.)

Fourth, it is clear that both plaintiff and other legislative aides had contact with a variety of elected officials. For example, plaintiff testified that she had contact not only with the legislative counsel's office, as noted *supra*, but also with individual elected officials and legislators and with the County Executive's Office. (*Id.* at 13:4-25, 18:7-19:13, 14:3-15:3.) Other legislative aides also had contact with elected officials, legislators, and the County Executive and County Executive Budget Office. (*Id.* at 15:4-16:20, 99:24-100:12, 116:5-7, 123:9-12.) Moreover, plaintiff also wrote in the Tonna memo that she "[w]orked to help in other legislator['s] district offices," "[i]nterfaced with the county [executive's] staff on legislative matters for the Presiding Officer," and "[i]nterfaced with various other elected officials and government agencies on behalf of the Presiding Officer." (Defs.' Ex. F at 4.) Further, as noted *supra*, plaintiff also lobbied legislators on behalf of the Presiding Officer (*id.*) and approached legislators to sponsor resolutions. (Pl.'s 56.1 ¶ 37.) The "vacant position review" forms submitted by plaintiff and the civil service job descriptions for legislative aides also confirm that contact with elected officials and other governmental bodies was an inherent part of the job. Specifically, the "vacant position review" forms provide that plaintiff shall attend committee and legislative meetings (Pl.'s Ex. H), and the civil service job descriptions, as quoted *supra*, describe a number of ways in which legislative aides are to assist and work with committees, chairpersons, other legislators, and counsel to the legislature. (*See* Defs.' Ex. G.)

Finally, the record also reflects that responsiveness to partisan politics and political leaders is an inherent duty for legislative aides. Not only may legislative aides be tasked with lobbying and "interfacing" with other legislators—duties which obviously require a certain level of political responsiveness—but aides also may

be involved in partisan caucus meetings and confidential executive sessions of legislative meetings. (*Id.* at 104:5-20, 130:5-131:5.) Indeed, political considerations are particularly important with regard to caucus meetings, where information is discussed that members of the caucus would not want to share with members of the opposing political party. Accordingly, as acknowledged by plaintiff, the legislative aides invited to attend caucus meetings belong to the same political party as the caucus. (*Id.* at 130:5-131:5.)

Thus, evaluating the final five *Vezzetti* factors as a whole, the Court finds that empowerment to act and speak on behalf of an elected official—in this case, the Presiding Officer—clearly is an inherent duty for the position of legislative aide. As a threshold matter, the Court notes that, in analyzing whether an employee is protected from patronage dismissals, there is no requirement that the employee have "communicat[ed] with legislators on 'important' or 'controversial' topics." *Alberti*, 393 F. Supp. 2d at 169. Instead, courts have held, and this Court agrees, that "employees serving a government in 'representative,' 'spokesperson,' or 'liaison' capacities are exempt from First Amendment protection under *Branti* and its progeny," even where the employee communicated with the legislature only on "basic, non-controversial issues." *Id.* (collecting cases). In *Alberti*, for example, one plaintiff, in her capacity as "liaison to the Legislature," had "sat in the audience during Legislative sessions and answered any of the legislators' 'basic' questions," but would not address any issues that "were not 'within the realm of the ordinary.'" *Id.* at 157-58. Similarly, another plaintiff was a member of the "Capital Committee" and the county "negotiating team," but claimed that he "'attended the meetings but had no say,' 'just sat there and listened,' and 'played no role in negotiations and had no input.'" *Id.* at 170. Nevertheless, the court found that both plaintiffs were not protected from politically-motivated termination, noting that, even where an employee communicates only on mundane issues, "a position that 'controls the lines of communication of a political actor must be inherently political,' as it 'involves access to confidential and political material.'" *Id.* at 170 (quoting *Faughender v. City of N. Olmsted, Ohio*, 927 F.2d 909, 914 (6th Cir. 1991)). Consequently, the court explained:

> The fact that an employee represents a governmental department at meetings or conferences similarly indicates that the employee is in a confidential position, and that his position demands political affinity with those he represents. *See, e.g.*, *Vazquez Rios v. Hernandez Colon*, 819 F.2d 319, 328 (1st Cir. 1987). The fact that the employee does not actively participate in such meetings is not determinative; federal courts have stated on several occasions that an employee who acts as the 'eyes and ears' of a policymaker at meetings is himself in a confidential relationship with the policymaker, unprotected under *Branti*.

*Id.* at 170-71 (citing *Ortiz Pinero v. Rivera Acevedo*, 900 F. Supp. 574, 581 (D.P.R. 1995)). Likewise, in this case, plaintiff and other legislative aides acted as the "eyes and ears" for the Presiding Officer at a variety of boards, commission, and committee meetings. In addition, it is undisputed that certain legislative aides—including plaintiff—were given not only speaking but also voting authority at these meetings. Indeed, plaintiff recalled that she "offered information" at meetings, brought questions back for the Presiding Officer, and, on at least one instance, voted for the Presiding

Officer at a meeting of the Seward Agency. Based upon this record, including plaintiff's own testimony and documents, the Court concludes that legislative aides plainly "*can* or *could* engage in tasks for which partisan or ideological affiliation likely affects performance." *Alberti*, 393 F. Supp. 2d at 169 (emphasis in original) (noting that "the Second Circuit and other federal courts have largely rejected arguments by government attorneys claiming First Amendment protection because they merely gave 'technical legal advice' or engaged in ministerial tasks, and did not make policy" and explaining that "what counts is whether the attorney *can* or *could* engage in tasks for which partisan or ideological affiliation likely affects performance" (citations omitted)).

Plaintiff stresses in opposition that not all aides may have been given speaking or "policymaking" responsibilities and that only a small percentage of time may have been spent on such work. (*See, e.g.*, Pl.'s Mem. of Law at 22, 26.) The Court, however, finds this argument to be unpersuasive. As noted *supra*, the policymaker inquiry focuses on the powers *inherent* to the position, not on the powers that may have been delegated to a particular aide for a particular amount of time. In other words, although not all aides may have been tasked with policymaking duties, and those duties may not have taken up 100% of the aides' time, the fact that some aides were given such duties for at least some amount of time plainly indicates that such responsibilities are within the inherent powers of the position. Indeed, the Second Circuit has made clear that even if a particular legislator has decided to narrowly define the scope of a position to exclude policymaking responsibilities, so long as the position *could* encompass such duties, a subsequent legislator must be empowered to give his staff greater policymaking

responsibilities for which political affiliation is a pertinent consideration.[11] *See Vona*, 119 F.3d at 208-09 ("[W]hile the Commissioner might employ assistant attorneys without regard to shared ideology, our decision here should not prevent her and her successors from using assistant attorneys in tasks requiring shared ideology. . . . Because the inherent power of the assistant attorney position *may* require the occupant to influence government programs and be responsive to politics, we are convinced that these factors favor the defendants here." (emphasis added)); *cf. Regan*, 984 F.2d at 580 ("There is no likely circumstance in which a shared ideology is more important than when an elected official appoints a deputy who may act in his or her stead. Elected officials are charged with carrying forth the mandate of the voting public, and in order to effectuate the policies promised the electorate, that official must be able to have trusted advisors and alternates who are directly accountable to that official.").

\* \* \*

In sum, having carefully evaluated each of the *Vezzetti* factors, the Court concludes that the inherent duties of a legislative aide as outlined herein make the position a policymaking one. This conclusion is supported not only by plaintiff's description of her own job duties and the duties of other legislative aides, but also by the breadth of the civil service job descriptions and the "vacant position review" forms for legislative aides, which state, *inter alia*, that a legislative aide shall "assist[] the

---

[11] In any event, even if the Court focused exclusively on what plaintiff actually did as a legislative aide as opposed to evaluating the inherent duties of the position (as plaintiff urges), the Court would reach the same conclusion that plaintiff is a policymaker based upon what she actually did, as described *supra*.

Legislature in administrative and research duties necessary for the operation of the Suffolk County Legislature" and shall "perform related work" as needed. (Defs.' Ex. G at 1; Pl.'s Ex. H.) Indeed, in *Vona*, the Second Circuit found that a similarly broad and "not well defined" job description, which stated, in relevant part, that employees would "assist[] and provide legal counsel" and "do[] related work as necessary to assist in the functioning of the legal division," supported a finding that the attorneys in question were policymakers, even though four of the seven *Vezzetti* factors weighed against such a conclusion. 119 F.3d at 207 ("Obviously this description is broad and not well defined. However, as the Supreme Court has indicated, '[a]n employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position' not protected from patronage dismissals.'" (quoting *Elrod*, 427 U.S. at 368)).

The fact that Lindsay kept at least one Republican on his staff with limited policymaking responsibilities does not change the Court's conclusion. As already noted *supra*, an elected official must have the flexibility to assign work to his staff and to define the scope of his staff's responsibilities as he sees fit.[12] *See Vona*,

119 F.3d at 208-09; *Regan*, 984 F.2d at 580. Moreover, the fact that one staff member may have been a member of the opposing party and may have had fewer policymaking responsibilities than others does not change the duties that are inherent to the legislative aide position. Again, the focus of the Court's inquiry is not on the particular job responsibilities of one individual, but instead is on the inherent powers vested in the position in question. Although the actual duties of plaintiff and other aides may inform that inquiry, *see Morin*, 626 F.3d at 46 n.5, the Court's analysis still is not an individualized one. Instead, the actual duties to which plaintiff testified simply provide examples of the types of responsibilities that may be inherent to the position of legislative aide. *Cf. Vona*, 119 F.3d at 208 (relying upon examples of work performed by certain employees in the position at issue).[13]

---

581 ("There is no case law to suggest that only a newly elected administration can dismiss an employee for political reasons.").

[13] Plaintiff also argues that plaintiff's testimony about the duties of legislative aides is ambiguous because plaintiff may have been confused "as to whether the term 'legislative aide' also encompassed the position of chief of staff," and "[c]onsequently, it is conceivable that any answers to questions concerning the scope of duties of the 'legislative aide' position may have incorporated duties undertaken during plaintiff's previous tenure as a chief of staff under Mr. Caracappa." (Pl.'s Mem. of Law at 22.) The Court, however, finds this argument unpersuasive. As an initial matter, having once served as a Chief of Staff, plaintiff plainly was aware of the distinction between a "legislative aide" and a Chief of Staff and either she or her attorney could have clarified the record regarding the respective responsibilities of each role had they felt it was necessary. In fact, throughout her deposition, plaintiff frequently qualified her answers to avoid any over-breadth

---

[12] Plaintiff also argues that the fact that she worked for both Democratic and Republican presiding officers and the fact that she was not replaced immediately by Lindsay when he took office require a conclusion that she is not a policymaker. The Court disagrees. Even though prior presiding officers decided to keep plaintiff in her position and Lindsay did not immediately replace her, there is no authority for the proposition that a newly elected official cannot replace an employee in a policymaking function for political reasons if a prior officeholder decided not to do so, or that a policymaker can only make such a replacement at the beginning of an administration. *See Regan*, 984 F.2d at

Accordingly, given that plaintiff was operating as a policymaker, she was not protected from dismissal based upon her political affiliation, and the Court therefore grants defendant's motion for summary judgment on the First Amendment claim.

## B. Equal Protection Claim[14]

Plaintiff has also brought a claim pursuant to 42 U.S.C. § 1983, alleging that defendants violated her civil rights under the Equal Protection Clause by discriminating against her on the basis of her age. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). For claims under § 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). Here, for purposes of pending cross-motions for summary judgment, the parties do not dispute that defendants were acting under color of state law. Thus, the question presented here is whether defendants' conduct deprived plaintiff of her Equal Protection rights. For the reasons set forth *infra*, the Court concludes that plaintiff has failed to present sufficient evidence from which a rational jury could find age discrimination in this case and, accordingly, grants defendants' motion for summary judgment on this claim.

### a. Legal Standard

Age-based employment discrimination claims brought pursuant to § 1983 are analyzed under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Kearney v. Cnty. of Rockland ex rel. Vanderhof*, 185 F. App'x 68, 70 (2d

---

[14] Plaintiff argues that defendants are precluded from moving for summary judgment on plaintiff's Equal Protection claim because "[n]either defendants' notice of motion nor their memorandum of law address plaintiff's Equal Protection claim." (Pl.'s Mem. of Law at 1.) The Court, however, disagrees. Defendants plainly stated in their motion papers that they were moving to dismiss plaintiff's complaint in its entirety, and plaintiff has had a full opportunity to (and, in fact, did) brief the issue on the merits. (*See, e.g.*, Defs.' Mem. of Law at 1; Pl.'s Reply at 7-8.) Accordingly, the Court rejects plaintiff's argument that defendants are

or confusion regarding the particular duties she was discussing. Moreover, when asked how her duties changed once she became Chief of Staff, plaintiff described duties that pertained only to management of the office and the staff and did not mention any changes regarding any of her other responsibilities, thus indicating that the bulk of her duties remained the same regardless of which level position she held. Indeed, as an example of the overlap in responsibilities between a "legislative aide" and Chief of Staff, plaintiff testified that she attended caucus meetings when she worked both as Chief of Staff for Presiding Officer Caracappa and when she worked as a legislative aide for other Presiding Officers. (Burkhardt Depo. at 141:11-16.) Furthermore, the job descriptions for a Legislative Aide, Legislative Aide II, and a Chief of Staff are substantially similar, and the main difference between a Chief of Staff and a lower-level legislative aide appears to be the Chief's supervisory role vis-à-vis the staff of the Presiding Officer. Accordingly, the Court rejects plaintiff's argument that the record is unclear regarding which level of legislative aide performed which types of duties.

procedurally foreclosed from moving for summary judgment on the Equal Protection claim.

Cir. 2006) (holding that plaintiff's "equal protection claim pursuant to 42 U.S.C. § 1983 for age-based employment discrimination fails for the same reasons that her ADEA and NYSHRL claims fail" under *McDonnell Douglas* analysis); *Sorlucco v. N.Y.C. Police Dep't*, 888 F.2d 4, 7 (2d Cir. 1989) (holding that three-step analysis outlined in *McDonnell Douglas* applies to claims brought under § 1983); *Shapiro v. N.Y.C. Dep't of Educ.*, 561 F. Supp. 2d 413, 422 n.2 (S.D.N.Y. 2008) ("An equal protection claim for age discrimination pursuant to § 1983 is analyzed under the same standards as a claim made pursuant to the ADEA.").

Under this analysis, "a plaintiff . . . has the initial burden of establishing a prima facie case of discrimination." *Sorlucco*, 888 F. 2d at 7. To establish a prima facie case of age discrimination, a plaintiff must demonstrate that: "(i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone 'substantially younger.'" *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)) (additional citations omitted). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "*de minimis.*" *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once a plaintiff establishes a *prima facie* case of discrimination, "the burden of production [shifts] to the defendant, who must proffer a 'legitimate, non-discriminatory reason' for the challenged employment action." *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001)). If the defendant articulates a legitimate, non-discriminatory reason, plaintiff must then prove that defendant's articulated reasons are pretextual. *Id.* "In short, the ultimate burden rests with the plaintiff to offer evidence 'sufficient to support a reasonable inference that prohibited [age] discrimination occurred.'" *Id.* (citing *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000)).

To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). However, meeting "*McDonnell Douglas's* minimal requirements of a prima facie case plus evidence from which a factfinder could find that the employer's explanation was false" does not automatically and necessarily require the denial of summary judgment and the submission of the case to the jury. *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—

particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### b. Application

The Court assumes, for purposes of this motion, that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*. In response, as set forth in great detail *supra*, defendants have established a legitimate, non-discriminatory reason for plaintiff's dismissal, namely, her political affiliation. Accordingly, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find age discrimination, and finds that plaintiff has failed to meet her burden. *See Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *Siano v. Haber*, 40 F. Supp. 2d 516, 519-20 (S.D.N.Y. 1999); *Lapsley v. Columbia Univ.-Coll. of Physicians & Surgeons*, 999 F. Supp. 506, 515 (S.D.N.Y. 1998). Specifically, plaintiff has not presented any evidence that Lindsay was aware of plaintiff's eligibility for retirement benefits prior to her termination. In fact, the only evidence in the record on this point reflects that Lindsay was not aware of plaintiff's eligibility until *after* he had informed her that she would be terminated and plaintiff then requested additional time to file her retirement papers. As Lindsay testified during his deposition:

> Q: At the time she was working for you, was Ms. Burkhardt eligible to retire?

A: I don't know.

> Q: Do you know now whether she was eligible to retire at the time she was working for you?

A: There came a time when she was notified that her employment would be severed, that she asked for additional time because she was filing her, her retirement papers.

(Lindsay Depo. at 87:14-21.)

Indeed, the uncontroverted evidence, as described extensively *supra*, establishes that plaintiff was fired because of her political affiliation, a point which both plaintiff and defendants concede. (*See, e.g.*, Pl.'s Mem. of Law at 19 ("[T]here is no dispute that plaintiff's employment was terminated because she was a Republican and because defendant, William Lindsay was looking to hire Democrats; nor do defendants contend otherwise. Since the record admits of only one conclusion in this regard, the only way for defendants to escape liability is to meet their burden of demonstrating that party affiliation was an appropriate requirement for the position of legislative aide."); Defs.' Mem. of Law at 24 ("Presiding Officer Lindsay replaced Plaintiff with better qualified candidates who shared the same political ideology with the Presiding Officer, and who became available after being terminated from their positions by the Town of Brookhaven.").)

The Court finds unavailing plaintiff's arguments that defendants' proffered non-discriminatory explanation is pretextual. First, the Court rejects plaintiff's argument that there is "extensive evidence" in the record that "Lindsay and his predecessors never viewed party affiliation as a necessary requirement for the legislative aide position." (Pl.'s Reply at 10.) As outlined

in detail in connection with plaintiff's First Amendment claim, the legislative aide position is undoubtedly a policymaking position for which political affiliation is an appropriate consideration, and there is no basis for plaintiff's contention that either Lindsay or other Presiding Officers found political considerations to be irrelevant to the position. To the contrary, plaintiff herself acknowledged that caucus meetings were attended only by legislative aides of the same party because of the confidential and political nature of the information discussed at those meetings. (Burkhardt Depo. at 130:5-131:5.) Second, the Court also finds unpersuasive plaintiff's argument that the "lack of qualifications" of the individuals hired in plaintiff's stead demonstrates the pretextual nature of defendants' explanation. (Pl.'s Reply at 10.) Again, even if all of plaintiff's evidence is accepted by the jury and all reasonable inferences are drawn in her favor, the only conclusion that a rational jury could reach is that the reason plaintiff and Siems were replaced was because of their party affiliation and because Lindsay wanted to replace them with two Democrats who had lost their jobs, and not because of age. In fact, one of the replacement hires was an attorney and another had "extensive management experience," and, accordingly, given their undisputed political loyalty, Lindsay determined that both of them were "more valuable" to his staff than Burkhardt and Siems. (Lindsay Depo. at 81:19-82:23.)

In sum, the Court finds that plaintiff has failed to present sufficient evidence from which a reasonable jury could find that she was discriminated against on the basis of her age,[15] and defendants therefore are entitled to summary judgment on this claim.[16]

### C. Disparate Impact under the ADEA

The parties do not dispute the standards that apply to a disparate impact age discrimination claim. Specifically, to establish a *prima facie* case, a plaintiff must "first identify a specific employment practice having an adverse impact upon members of the protected class, and then show causation, i.e., that the practice excluded him or her, as a member of a protected group, from a job or promotion opportunity." *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106,

---

[15] The Court notes that plaintiff testified at her deposition that, after she was informed of her termination, she spoke to Minority Leader Losquardro, who told plaintiff that "he had a conversation with Mr. Lindsay that they were choosing [plaintiff] and Ms. Siems because [Siems] was already collecting her retirement and [plaintiff] was eligible to take [hers]." (Burkhardt Depo. at 154:7-14.) Plaintiff's counsel conceded at oral argument, however, that Losquardro denied making this statement, thus creating a factual dispute on this point. In any event, this factual dispute is not material to the Court's ruling, because there is no evidence in the record to indicate that Legislator Losquardro played any role or had any involvement in the decision to fire plaintiff, or what the basis would be for this conclusory statement. Accordingly, a jury could not rationally find age discrimination based on this conclusory statement made by Losquardro, even if the jury found that the statement was made, given the complete absence of any other evidence in the record of age discrimination.

[16] The Court also notes that, to the extent plaintiff is seeking to bring a claim that she was singled out as a "class-of-one," such claims are not available in the public employment context. *See Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 598 (2008). Moreover, because the Court finds that plaintiff has failed to present sufficient evidence in support of her claim on the grounds discussed above, the Court need not reach defendants' remaining arguments in support of their motion for summary judgment on this claim.

115 (2d Cir. 1992) (internal quotation marks and citations omitted). As explained by the Second Circuit, "[t]he rule that emerges from prior cases is that a prima facie case is made out by showing either a gross statistical disparity, or a statistically significant adverse impact coupled with other evidence of discrimination." *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1375 (2d Cir. 1991); *see also Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 160 (2d Cir. 2001) ("[S]tatistical proof almost always occupies center stage in a prima facie showing of a disparate impact claim."). If a plaintiff makes a *prima facie* showing, "[a]n employer may then show that the challenged practice had a legitimate purpose. If the employer meets this burden, the plaintiff must prove that the proffered purpose is pretextual." *Dist. Council 37, Am. Federation of State, Cnty. & Municipal Emps., AFL-CIO v. N.Y.C. Dep't of Parks & Recreation*, 113 F.3d 347, 352 (2d Cir. 1997) (internal citations omitted). Moreover, a disparate impact claim "must allege a disparate impact on the entire protected group, *i.e.*, workers aged 40 and over." *Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997).

Here, plaintiff has provided no statistical evidence whatsoever demonstrating disparate impact of an employer policy based on age. Instead, she simply has pointed to the fact that she and another woman over the age of forty were terminated, and another individual between the ages of thirty and thirty-nine was not terminated. (*See* Pl.'s Mem. of Law at 30-31.) As stated by the Supreme Court, "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical

disparities." *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241 (2005) (emphasis in original) (internal quotation marks and citations omitted). Plaintiff clearly has failed to meet this burden. Indeed, plaintiff has presented no evidence regarding how many workers there were in the entire protected group, and therefore the Court is unable to make any determination regarding whether there was a disparate impact on the entire group, or whether plaintiff's and Siem's terminations were statistically significant. *See Nathe v. Weight Watchers Intern., Inc.*, No. 06 Civ. 4154 (DAB), 2010 WL 3000175, at *6 (S.D.N.Y. July 26, 2010) (granting summary judgment for defendants on disparate impact claim where, *inter alia*, "[p]laintiff also fails to provide any statistical data to show that Weight Watchers' policies led to discrimination against similarly-situated older group leaders" because "[a] plaintiff cannot proceed with a disparate impact claim when they fail to present any statistical evidence demonstrating that an employer policy created an adverse impact based on age"); *cf. Maresco*, 964 F.2d at 113 (plaintiff had presented sufficient evidence that his discharge occurred under circumstances giving rise to an inference of discrimination where he demonstrated that two out of three older employees were terminated and none of the twenty younger employees were terminated). Moreover, not only does plaintiff fail to provide any statistical evidence to support a disparate impact claim, but, as noted *supra*, there is no other evidence to support a disparate impact claim in this case. It is uncontroverted that the employment practice at issue was based on political affiliation, rather than age. Thus, even accepting plaintiff's evidence and drawing all reasonable inference in her favor, no rational jury could find disparate impact based on age. Accordingly,

defendants are entitled to summary judgment on this claim.[17]

## IV. Conclusion

For the reasons set forth herein, defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Date: September 19, 2011
        Central Islip, NY

\* \* \*

Plaintiff is represented by Wayne J. Schaefer, Law Offices of Wayne J. Schaefer, LLC, 199 East Main Street, Suite 4, Smithtown, NY 11787. Defendants are represented by John Richard Petrowski, Brian P. Callahan, and Jennifer K. Siegel of the Suffolk County Attorney's Office, 100 Vets Memorial Hwy, Hauppauge, NY 11788.

---

[17] Because the Court has found that all of plaintiff's claims cannot survive summary judgment, the Court need not reach defendant Lindsay's argument that he is also entitled to qualified immunity.